

JUL 19 2023

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:23-cr- 092 |
| | ) | |
| KULBIR KAUR, | ) | |
| also known as "LOVELY," | ) | 18 U.S.C. §§ 1594(b) and 1589 |
| (Counts 1-7) | ) | Conspiracy to Commit Forced Labor |
| | ) | (Count 1) |
| and | ) | |
| | ) | 18 U.S.C. §§ 1589, 1594(a), and 2 |
| HARMANPREET SINGH | ) | Forced Labor |
| (Counts 1-7) | ) | (Count 2) |
| Defendants. | ) | |
| | ) | 8 U.S.C. § 1324 and 18 U.S.C. § 2 |
| | ) | Harboring an Alien for Financial Gain |
| | ) | (Count 3) |
| | ) | |
| | ) | 18 U.S.C. § 1592 and 2 |
| | ) | Document Servitude |
| | ) | (Count 4) |
| | ) | |
| | ) | 18 U.S.C. § 1597 and 2 |
| | ) | Unlawful Conduct with Respect to |
| | ) | Immigration Documents |
| | ) | (Count 5) |
| | ) | |
| | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy to Commit Bankruptcy Fraud |
| | ) | and Make Fraudulent Transfers In |
| | ) | Contemplation of Bankruptcy |
| | ) | (Count 6) |
| | ) | |
| | ) | 18 U.S.C. § 152(7) and 2 |
| | ) | Fraudulent Transfers in Contemplation of |
| | ) | Bankruptcy |
| | ) | (Count 7) |
| | ) | |
| | ) | |
| | ) | Forfeiture Allegation |

1

## INDICTMENT

July 2023 Term – At Richmond, Virginia

THE GRAND JURY CHARGES THAT:

## INTRODUCTION

At all times relevant to this Indictment:

1.      Defendants, KULBIR KAUR (also known as "LOVELY") and

HARMANPREET SINGH (individually, "KAUR" and "SINGH," respectively, and collectively,

"defendants"), were residents of Chesterfield, Virginia, within the Eastern District of Virginia.

On or about February 19, 2014, KAUR and SINGH married each other in Chesterfield, Virginia,

and KAUR and SINGH subsequently had two children together.

2.      B.S., whose identity is known to the Grand Jury, was SINGH's cousin.  B.S. was

a citizen of India.  B.S.'s Indian passport listed his birth year as 2001.

3.      On February 3, 2017, the U.S. Government issued B.S. a B-1/B-2 nonimmigrant

visa ("NIV").  B.S.'s Indian passport, to which the B-1/B-2 NIV was affixed, expired on

February 3, 2019.

4.      A B-1/B-2 NIV, commonly known as a "visitor visa," permits individuals to enter

the United States temporarily for purposes of tourism or brief business.  Individuals who enter

the United States on B-1/B-2 NIVs are not permitted to work while in the United States.  An

individual who remains in the United States past the expiration of his or her B-1/B-2 NIV

remains in the United States in violation of law.

2

## COUNT ONE
(Conspiracy to Commit Forced Labor)

5.     The allegations set forth in the Introduction are realleged as if fully set forth herein.

6.     From in or about February 2018, and continuing until on or about December 14, 2021, within the Eastern District of Virginia and elsewhere, defendants KULBIR KAUR (also known as "LOVELY") and HARMANPREET SINGH, together and with others known and unknown to the Grand Jury, did knowingly and intentionally combine, confederate, conspire, and agree with each other to provide and obtain the labor and services of B.S. by means of force, threats of force, physical restraint, and threats of physical restraint to B.S. and any other person; serious harm and threats of serious harm to B.S. and any other person; the abuse and threatened abuse of law and legal process; and a scheme, plan, and pattern intended to cause B.S. to believe that, if B.S. did not perform such labor and services, B.S. and any other person would suffer serious harm, in violation of Title 18, United States Code, Section 1589.

### The Object of the Conspiracy

7.     The object of the conspiracy was to obtain and maintain the labor and services of B.S. at a gas station and convenience store owned by SINGH in North Chesterfield, Virginia (hereafter, the "Lovely Market"), within the Eastern District of Virginia, for minimal compensation.

### The Manner and Means of the Conspiracy

8.     The manner and means by which the co-conspirators carried out the object of the conspiracy included, but were not limited to, the following:

3

a. The defendants, together with others known and unknown to the Grand Jury, accompanied B.S. into the United States after falsely assuring B.S. and his parents that they would help B.S. enroll in school in the United States. Once in the United States, the defendants continued to falsely promise B.S. that they were trying to enroll him in school.

b. The defendants, together with others known and unknown to the Grand Jury, compelled B.S. to provide labor and services at the Lovely Market, including cleaning, operating the kitchen to prepare fried chicken, acting as cashier, and managing store records.

c. After arriving in the United States, the defendants, together with others known and unknown to the Grand Jury, confiscated, possessed, and maintained control of B.S.'s passport and other immigration documents. The defendants retained control of B.S.'s passport and visitor visa even after these documents expired. Thereafter, the defendants used the threat of legal consequences stemming from B.S.'s immigration status to compel B.S.'s work.

d. The defendants, together with others known and unknown to the Grand Jury, isolated B.S. and compelled B.S. to live, at times, in degrading living conditions by, among other things: (1) making B.S. work extensive hours; (2) only permitting B.S. to talk about certain things with others at the store; (3) monitoring B.S.'s activity, including through video and audio surveillance in the store; (4) limiting B.S.'s access to the internet and communications at times; (5) instructing B.S. to not discuss his work conditions and lack of attendance at school with others; (6) leaving B.S. without transportation; (7) leaving B.S. to, on occasion,

4

sleep overnight on a mattress in a small office of the Lovely Market; (8) limiting

B.S.'s financial resources by not paying him directly and by confiscating B.S.'s

money accumulated from gratuities earned at the Lovely Market; (9) restricting

B.S.'s access to certain food and, at times, requiring B.S. to obtain meals from

items stocked at the Lovely Market convenience store; and (10) withholding

medical care from B.S.

e. The defendants, together with others known and unknown to the Grand Jury,

created a climate of fear to induce B.S. to continue working at the Lovely Market,

including by threatening B.S. with physical abuse and death and by subjecting

B.S. to physical, verbal, and psychological abuse.

f. The defendants, together with others known and unknown to the Grand Jury,

controlled B.S. by compelling him to marry KAUR and then using that marriage

to further threaten B.S., including by threatening to use the marital status to take

away B.S.'s family's property in India.

g. KAUR made false allegations against B.S. with law enforcement authorities in an

attempt to cover up the defendants' criminal conduct and to cast doubt on B.S.'s

credibility.

h. The defendants made false statements to law enforcement to conceal the fact and

nature of B.S.'s work at the Lovely Market.

## Overt Acts

9.    In furtherance of the conspiracy and to accomplish the object of the conspiracy, at

least one of the defendants committed and caused to be committed at least one of the following

overt acts, among others, in the Eastern District of Virginia and elsewhere:

5

a. In or about February 2018, KAUR and SINGH, together with others known and unknown to the Grand Jury, falsely represented to B.S. and his parents that they would help B.S. enroll in school in the United States.

b. In or about February 2018, KAUR and SINGH, together with others known and unknown to the Grand Jury, traveled with B.S. from New Delhi, India, to the Dulles International Airport, within the Eastern District of Virginia.

c. On or about February 28, 2018, after arriving in the United States, KAUR took possession of B.S.'s passport and B-1/B-2 NIV after passing through customs screening, and the defendants possessed and maintained control of those documents until on or about May 24, 2021.

d. From on or about March 1, 2018, and continuing through in or about May 2021, KAUR and SINGH required B.S. to work extensive hours at the Lovely Market. Throughout this time, KAUR and SINGH both sent instructions to B.S. regarding the day-to-day management of the store.

e. After arriving in the United States, KAUR and SINGH instructed B.S. to lie to his parents and tell them that he was indeed attending school, so as not to arouse suspicion.

f. Just three weeks after B.S. arrived in the United States, in or about March 2018, B.S. requested his passport back from the defendants in order to leave and return to India. The defendants refused to return B.S.'s passport and SINGH physically kicked B.S.

g. Thereafter, the defendants repeatedly refused to return B.S.'s passport and B-1/B-2 NIV and continued to falsely promise B.S. that they would enroll him in

6

school.  The defendants caused B.S. to remain in the United States past the
expiration of his passport and B-1/B-2 NIV in February 2019 in violation of law.

h.  After the expiration of B.S.'s passport and B-1/B-2 NIV, the defendants
threatened B.S. with immigration consequences related to B.S.'s lack of current
immigration documents to induce B.S. to continue working.

i.  Throughout the time that B.S. resided with SINGH and KAUR in the United
States, the defendants did not directly pay B.S. any wages for his labor and
services, or allow B.S. to keep gratuities provided to B.S. by customers of the
Lovely Market for B.S.'s work at the store.  The defendants only made several,
irregular payments to B.S.'s parents that amounted to a fraction of what B.S.
would have been owed for his labor and services.

j.  Throughout the time that B.S. resided with SINGH and KAUR in the United
States, the defendants would, on occasion, force B.S. to sleep overnight on a
mattress in a small office at the Lovely Market.

k.  Throughout the time that B.S. resided with SINGH and KAUR in the United
States, the defendants consistently physically and mentally abused B.S. when B.S.
complained to the defendants about working and not being enrolled in school, and
when B.S. requested his passport be returned so that he could leave the United
States and return home to India.

l.  In or about August 2019, SINGH physically abused and threatened B.S. to
compel him to marry KAUR.

7

m. On or about August 19, 2019, the defendants compelled B.S., who had by then turned 18 years old, to marry KAUR in a civil ceremony taking place at the defendants' residence.

n. After this marriage, KAUR threatened B.S., stating that she would use her marital status to confiscate B.S.'s family's property in India if B.S. left.

o. In or about January 2021, KAUR reported to SINGH that B.S. was trying to take a day off work due to illness, and SINGH later threatened B.S. with a firearm to ensure that B.S. continued working.

p. In or about February 2021, when SINGH learned that B.S. had told a Lovely Market customer not to give B.S. any gratuities because the defendants were confiscating B.S.'s gratuities, SINGH threatened B.S. with a firearm.

q. In or about June 2021, KAUR filed a false law enforcement complaint against B.S. in an attempt to cover up the defendants' criminal conduct and to cast doubt on B.S.'s credibility. The complaint alleged, among other things, that B.S. took KAUR's jewelry and abused KAUR and her children.

r. On or about December 14, 2021, the defendants made false statements to law enforcement to conceal the fact and nature of B.S.'s work at the Lovely Market. For instance, SINGH stated that B.S. did not work at the Lovely Market, and KAUR stated that she had "no idea" whether B.S. worked at the Lovely Market; both SINGH and KAUR knew these statements to be false.

(All in violation of Title 18, United States Code, Sections 1594(b) and 1589.)

8

## COUNT TWO
(Forced Labor)

10.    The allegations set forth in the Introduction and Count One, including sub-paragraphs, are realleged as if fully set forth herein.

11.    From in or about March 2018, and continuing through in or about May 2021, within the Eastern District of Virginia and elsewhere, defendants KULBIR KAUR (also known as "LOVELY") and HARMANPREET SINGH, aiding and abetting each other, attempted to and did knowingly provide and obtain the labor and services of B.S. by means of force, threats of force, physical restraint, and threats of physical restraint to B.S. and any other person; serious harm and threats of serious harm to B.S. and any other person; the abuse and threatened abuse of law and legal process; and a scheme, plan, and pattern intended to cause B.S. to believe that, if B.S. did not perform such labor and services, B.S. and any other person would suffer serious harm.

(All in violation of Title 18, United States Code, Sections 1589, 1594(a), and 2.)

## COUNT THREE
(Harboring an Alien for Financial Gain)

12.    The allegations set forth in the Introduction and Paragraphs 7 through 9 of Count One, including sub-paragraphs, are realleged as if fully set forth herein.

13.    From in or about March 2018, and continuing through in or about May 2021, within the Eastern District of Virginia and elsewhere, defendants KULBIR KAUR (also known as "LOVELY") and HARMANPREET SINGH, aiding and abetting each other and others known and unknown to the Grand Jury, knowing and in reckless disregard of the fact that an alien, namely, B.S., had come to, entered, and remained in the United States in violation of law,

9

attempted to and did conceal, harbor, and shield B.S. from detection in buildings and other places for the purpose of private financial gain.

(All in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i), and Title 18, United States Code, Section 2.)

### COUNT FOUR
(Document Servitude)

14.     The allegations set forth in the Introduction and Counts One and Two, including sub-paragraphs, are realleged as if fully set forth herein.

15.     From in or about February 2018, and continuing through in or about May 2021, within the Eastern District of Virginia and elsewhere, defendants KULBIR KAUR (also known as "LOVELY") and HARMANPREET SINGH, aiding and abetting each other and others known and unknown to the Grand Jury, did knowingly conceal, remove, confiscate, and possess actual passports and other immigration documents, and other actual government identification documents, of B.S.: (a) in the course of violations of Title 18, United States Code, Sections 1589 and 1594(a); and (b) with the intent to violate Title 18, United States Code, Sections 1589.

(All in violation of Title 18, United States Code, Sections 1592 and 2.)

### COUNT FIVE
(Unlawful Conduct with Respect to Immigration Documents)

16.     The allegations set forth in the Introduction, Paragraphs 7 through 9 on Count One, and Count Three, including sub-paragraphs, are realleged as if fully set forth herein.

17.     From in or about February 2018, and continuing through in or about May 2021, within the Eastern District of Virginia and elsewhere, defendants KULBIR KAUR (also known as "LOVELY") and HARMANPREET SINGH, aiding and abetting each other and others known and unknown to the Grand Jury, did knowingly conceal, remove, confiscate, and possess actual

10

passports and other immigration documents of B.S.: (a) in the course of violations of

Title 8, United States Code, Section 1324; and (b) with the intent to violate

Title 8, United States Code, Section 1324.

(All in violation of Title 18, United States Code, Sections 1597 and 2.)

**COUNT SIX**
(Conspiracy to Commit Bankruptcy Fraud and Make Fraudulent Transfers in
Contemplation of Bankruptcy)

18.     The allegations set forth in the Introduction and Paragraphs 7 through 9 of Count

One, including sub-paragraphs, are realleged as if fully set forth herein.

19.     KULBIR KAUR (also known as "LOVELY"), HARMANPREET SINGH, and

other co-conspirators, known and unknown, beginning at a time unknown, but no later than in or

about May 2018, and continuing through on or about April 13, 2021, in the Eastern District of

Virginia and elsewhere, did knowingly and intentionally combine, conspire, confederate, and

agree with individuals, both known and unknown, to commit offenses against the United States,

to wit: (1) Bankruptcy Fraud, that is, to knowingly devise a scheme to defraud in relation to a

bankruptcy proceeding, in violation of 18 U.S.C. § 157; and (2) Fraudulent Transfers in

Contemplation of Bankruptcy, that is, to knowingly and fraudulently conceal and transfer

property belonging to the estate of a debtor, in violation of 18 U.S.C. § 152(7).

**Underlying Bankruptcy Definitions and Processes**

20.     Bankruptcy is a process by which a debtor (*e.g.*, an individual filing for

bankruptcy) obtains relief from its creditors (those who are owed money by the debtor). The

process is designed to achieve the orderly transfer of a debtor's assets to creditors from available

assets truthfully disclosed by the debtor, and to provide a "fresh start" to honest debtors,

allowing those individuals to obtain a discharge of debt incurred prior to the debtor's filing for

11

bankruptcy. The process is conducted in a federal court and is governed by the United States Bankruptcy Code, which is found in Title 11 of the United States Code.

21. Chapter 7 bankruptcy cases are designed to liquidate all of a debtor's assets and distribute the proceeds they generate to creditors. The Office of the United States Trustee appoints and oversees trustees in Chapter 7 cases (the "Chapter 7 Trustee"); that Chapter 7 Trustee gathers assets and generally acts on behalf of unsecured creditors. Secured creditors (those holding liens or mortgages) are typically represented by attorneys.

22. The Chapter 7 Trustee gathers and sells the debtor's nonexempt assets and uses the proceeds from the sale of such assets to pay creditors. Part of the debtor's property may be subject to liens and mortgages that pledge the property to other creditors. In addition, the Bankruptcy Code allows the debtor to keep certain "exempt" property; but a trustee will liquidate the debtor's remaining non-exempt assets. Accordingly, debtors should realize that the filing of a petition under Chapter 7 may result in the loss of property. The benefit to a debtor under Chapter 7 is the issuance of a discharge by the Bankruptcy Court, which prevents creditors from pursuing the collection of debts incurred before the bankruptcy was filed.

23. Creditors will only be paid from the proceeds of the debtor's estate obtained by the Chapter 7 Trustee ("bankruptcy estate"). Accordingly, when a debtor or debtors file a Chapter 7 bankruptcy petition, they are not allowed to remain in possession of the property comprising the bankruptcy estate or to conceal assets of the bankruptcy estate. Nor is the debtor allowed to transfer assets out of the bankruptcy estate in contemplation of filing a bankruptcy petition.

24. A debtor is required to complete and file several documents with the Bankruptcy Court to carry out the bankruptcy process. These documents consist of a Petition, which

contains summary information about the debtor's financial condition, various Bankruptcy

Schedules, and a Statement of Financial Affairs. These documents contain, among other things,

detailed information about the debtor's assets, liabilities, recent payments to creditors, past and

current income, and anticipated future income. The Petition, Statement of Financial Affairs, and

Bankruptcy Schedules are required to be signed by the debtor and certified under penalty of

perjury that the information contained in them is true and correct.

25.     As part of the bankruptcy process, every debtor must submit to a meeting

conducted by the Chapter 7 Trustee or an employee of the United States Trustee's Office who is

assigned to oversee and to administer the bankruptcy case. At this meeting, referred to as a

"creditors' meeting" or a "341 meeting," the debtor is placed under oath and questioned about

the information contained in the bankruptcy documents and about the debtor's general financial

condition.

## Purpose of the Scheme and Artifice to Defraud

26.     The purpose of the scheme was for KAUR, SINGH, and their co-conspirators,

known and unknown, to: (1) unlawfully enrich themselves at the expense of creditors through the

bankruptcy process; and (2) conceal the true ownership of assets and liabilities to defeat controls

put in place to ensure the integrity of the bankruptcy process.

## The Manner and Means of the Scheme and Artifice to Defraud

27.     The manner and means of the scheme and artifice to defraud included, but were

not limited to, the following: (1) transferring and attempting to transfer KAUR's assets to

SINGH in contemplation of KAUR's filing for bankruptcy; (2) transferring and attempting to

transfer SINGH's liabilities to KAUR in contemplation of KAUR's filing for bankruptcy; (3)

filing for a sham divorce to effectuate the above-mentioned transfers of assets and liabilities; (4)

filing a Chapter 7 bankruptcy petition with materially false statements and representations and making other material false statements under oath; (5) running up credit card debt, both before and after KAUR filed a petition for Chapter 7 bankruptcy; and (6) concealing information from and lying to the Chapter 7 Trustee, the United States Trustee's Office, and the United States Bankruptcy Court.

**Conduct in Furtherance of the Scheme and Artifice to Defraud**

A. *KAUR and SINGH conducted fraudulent transactions in contemplation of bankruptcy.*

28.     On or about November 27, 2013, KAUR purchased a single-family dwelling in Chesterfield, Virginia (hereinafter HOME 1), obtaining a mortgage in her own name only. No other individuals were listed on the deed for HOME 1. On or about February 19, 2014, KAUR and SINGH married each other in Chesterfield, Virginia. On or about August 9, 2018, in anticipation of KAUR's future bankruptcy filing, KAUR transferred the deed to HOME 1 to SINGH, receiving no money in exchange. At the time of the transfer, KAUR had accumulated at least $70,000 in home equity in HOME 1.

29.     Beginning at least as early as May 10, 2018, and continuing through at least on or about January 11, 2019, KAUR and SINGH made numerous purchases on credit cards in the lead-up to KAUR filing for bankruptcy. For instance, on or about May 27, 2018, the defendants made two purchases totaling $11,431 for jewelry at Karan Jewelers in Jackson Heights, New York, using an American Express card in SINGH's name (card number ending in -1011). During this same timeframe, KAUR and SINGH also made numerous credit card purchases for the Lovely Market in the lead-up to KAUR filing for bankruptcy:

14

a. On or about May 10, 2018, KAUR made an $18,372 purchase on a Discover Card in her name (card number ending in -6041) for maintenance servicing related to the Lovely Market gas station.

b. On or about May 21, 2018, KAUR made a $3,121 purchase at Sam's Club on a Synchrony Bank Card in her name (account ending -2340) for tobacco products for the Lovely Market. Notably, the address on these card statements was the address of the Lovely Market.

c. On or about June 18, 2018, KAUR made a $231.61 purchase on an American Express card in her name (card number ending in -3009) for maintenance servicing related to the Lovely Market gas station.

d. On or about July 31, 2018, KAUR made a $785.95 purchase on a Chase card in SINGH's name (account number ending in -8388) for maintenance servicing related to the Lovely Market gas station.

e. On or about September 19, 2018, SINGH bought $4,590.65 worth of tobacco products from Costco for the Lovely Market using a Chase card in his name (account number ending in -4867).

f. On or about January 11, 2019, SINGH bought $1,062.74 worth of tobacco products from Costco for the Lovely Market using a Chase card in his name (account number ending in -8388).

B. *KAUR and SINGH moved the couple's entire debt to KAUR and assets to SINGH.*

30. On or about January 22, 2019, KAUR and SINGH prepared and executed a property settlement agreement and separation agreement ("PSA"), purportedly in contemplation of divorce. The PSA stated in relevant part that KAUR was assigned all of the couples' credit

card debt. Assets that previously belonged to KAUR, including HOME 1, were assigned to SINGH for no money in exchange. The PSA claimed that KAUR and SINGH separated from each other on December 20, 2017, and that the defendants "are now living separate and apart from each other, and have voluntarily and mutually agreed to continue to live separate and apart. . ." In truth, KAUR and SINGH continued to live together after December 20, 2017.

31.     KAUR and SINGH thereafter filed a divorce petition in Chesterfield County Circuit Court along with the PSA. KAUR prepared all the documents for the divorce filing and neither party was represented by counsel. In the divorce filing, SINGH was falsely listed as residing at the address of the Lovely Market. On February 6, 2019, the Chesterfield County Circuit Court finalized an uncontested, no-fault divorce between SINGH and KAUR. The divorce decree incorporated the terms of the above-described PSA.

32.     On about February 11, 2019, less than a week after the divorce was finalized, KAUR filed and caused to be filed in the United States Bankruptcy Court for the Eastern District of Virginia a voluntary bankruptcy petition under Chapter 7 of the United States Bankruptcy Code in the proceeding entitled *In re Kulbir Kaur*, Case No. 19-30710-KRH.

C.  *KAUR lied throughout the bankruptcy process.*

33.     The Chapter 7 bankruptcy petition contained sworn statements KAUR made under penalty of perjury. Thereafter, on or about April 16, 2019, in furtherance of this scheme and in an effort to obtain the Bankruptcy Court's approval of the Chapter 7 bankruptcy petition, KAUR gave sworn testimony, under oath and penalty of perjury, at a 341 meeting conducted by a representative of the United States Trustee's Office (hereafter "341 meeting").

34.   KAUR made false and misleading statements throughout her Chapter 7 bankruptcy petition and throughout the 341 meeting in order to hide the nature of the defendants' credit card debt.  For example:

    a.  In her Chapter 7 bankruptcy petition, KAUR falsely claimed that the debt associated with KAUR and SINGH's credit cards was incurred by KAUR only.  KAUR further falsely claimed that she did not have any co-debtors for the credit card debt – *i.e.,* "people or entities who are also liable for any debts you may have."

    b.  In her 341 meeting, KAUR falsely claimed to have not made purchases related to the Lovely Market, which KAUR claimed was solely owned and run by SINGH.  When asked, "What were you buying?" KAUR responded, "Just stuff for the home, grocery."  In truth and in fact, as KAUR well knew, despite her disavowal of any responsibility for the Lovely Market, her credit card debt consisted of many expenditures for the Lovely Market, including servicing costs for the gas station equipment and tobacco products.

    c.  In her 341 meeting, to further distance herself from Lovely Market related expenditures, KAUR falsely claimed that she never was an employee, owner, or officer of Lovely Market.  KAUR also falsely claimed that she never worked at the Lovely Market without pay.  In truth and in fact, KAUR routinely corresponded with vendors and contractors on behalf of the Lovely Market.  KAUR also sent numerous written instructions to B.S. concerning the day-to-day operations of Lovely Market.

17

35.     KAUR made false and misleading statements throughout her Chapter 7 bankruptcy petition and throughout the 341 meeting to hide the ownership of HOME 1 and the accumulated home equity.  For example:

      a.  In her Chapter 7 bankruptcy petition, KAUR falsely claimed that "she thought since [SINGH] made all the [mortgage] payments that she must deed [HOME 1] to him."

      b.  In her 341 meeting, KAUR falsely claimed that SINGH made the mortgage payments for HOME 1.  In truth and in fact, KAUR bought HOME 1 in her own name alone and made mortgage payments for HOME 1 from her Wells Fargo account (account ending -5012).  KAUR was the only authorized user of this account.

36.     KAUR made false and misleading statements throughout the Chapter 7 bankruptcy petition and throughout the 341 meeting to misrepresent the nature of her relationship with SINGH and to further legitimize the bankruptcy.  For example:

      a.  In her 341 meeting, KAUR falsely stated that she was in the process of moving to another residence, separate from SINGH.  KAUR further represented during the bankruptcy process, through her attorney, that she suffered abuse at the hands of SINGH to lend credibility to the purported separation.  In truth and in fact, KAUR and SINGH both moved to a new residence that SINGH purchased and continued to cohabit through at least December of 2021. KAUR and SINGH further went on a roughly six-month vacation to India together in or about January 2020, while the bankruptcy proceeding was pending.

18

      b.  The Chapter 7 bankruptcy petition further stated that the "debtor is in the process of divorce from her husband," stating that the defendants "separated in 2018." In truth and in fact, though the sham divorce had been finalized by the Chesterfield County Circuit Court five days before the filing of the Chapter 7 bankruptcy petition, the defendants continued to live together.

*D. KAUR and SINGH conducted fraudulent transactions after filing for bankruptcy.*

37.    After KAUR filed a Chapter 7 bankruptcy petition and assumed all the credit card debt of SINGH, the defendants continued to run up their credit card debts. For instance, on or about March 22, 2019, SINGH bought $2,114.12 worth of tobacco products from Costco for the Lovely Market using a Chase card in KAUR's name (account ending in -4152). KAUR claimed this credit card as belonging to KAUR on her Chapter 7 bankruptcy petition.

38.    On or about August 14, 2019, SINGH paid $18,000 and caused the corporate entity of Lovely Market to pay $6,000 to settle KAUR's bankruptcy estate's claims against SINGH pertaining to HOME 1. In truth and in fact, this $24,000 was a fraction of the actual existent home equity in HOME 1.

39.    On or about August 14, 2020, the United States Bankruptcy Court granted KAUR a discharge of all debts, including credit card debt on behalf of KAUR and SINGH.

40.    On or about April 13, 2021, SINGH transferred back the deed to HOME 1 to KAUR for no money in exchange. Thereafter, KAUR continued to own HOME 1.

(All in violation of Title 18, United States Code, Section 371.)

19

## COUNT SEVEN
(Fraudulent Transfers in Contemplation of Bankruptcy)

41.     The allegations set forth in the Introduction and Count Six, including sub-paragraphs, are realleged as if fully set forth herein.

42.     On or about August 9, 2018, in the Eastern District of Virginia, KULBIR KAUR (also known as "LOVELY") and HARMANPREET SINGH, defendants herein, aided and abetted by each other, in contemplation of filing a bankruptcy case under Title 11 of the United States Code, specifically the case entitled *In re Kulbir Kaur*, Case No. 19-30710-KRH, filed on February 11, 2019, in this district, and with the intent to defeat the provisions of Title 11, knowingly and fraudulently transferred property, to wit: KULBIR KAUR fraudulently transferred the deed of HOME 1, a single family dwelling in the Eastern District of Virginia, and the equity accumulated in the dwelling, to defendant HARMANPREET SINGH.

(All in violation of Title 18, United States Code, Section 152(7) and 2.)

## CRIMINAL FORFEITURE

43.     Upon conviction of the offenses set forth in Counts One, Two, and Four of this Indictment, the defendants, KULBIR KAUR (also known as "LOVELY") and HARMANPREET SINGH, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 1594(d), and Federal Rule of Criminal Procedure 32.2:

> a.  Any property, real or personal, constituting or derived from, any proceeds obtained, directly or indirectly, as the result of the violation, and any property traceable to such property; and

20

      b. Any property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of the violation, and any property traceable to such property.

44.    Upon conviction of the offense in violation of Title 8, United States Code, Section 1324 set forth in Count Three of this Indictment, the defendants, KULBIR KAUR (also known as "LOVELY") and HARMANPREET SINGH, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(6), Title 8, United States Code, Section 1324(b)(1), Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2:

      a. Any conveyance, including any vessel, vehicle, or aircraft used in the commission of the offense of which the person is convicted; and

      b. Any property, real or personal –

          i. that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted; or

          ii. that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of which the person is convicted.

45.    Upon conviction of the offenses in violation of Title 18, United States Code, Sections 371 and 152 set forth in Counts Six and Seven of this Indictment, the defendants, KULBIR KAUR (also known as "LOVELY") and HARMANPREET SINGH, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2, any

property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

46.     If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

(In accordance with Title 18, United States Code, Sections 1594(d), 982(a)(6), 981(a)(1)(C); Title 28, United States Code, Section 2461(c); Title 21, United States Code, Section 853(p); Title 8, United States Code, Section 1324(b)(1).)

A TRUE BILL:

FOREPERSON

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office

JESSICA D. ABER
United States Attorney

By:

Avi Panth
Assistant United States Attorney
United States Attorney's Office

KRISTEN M. CLARKE
Assistant Attorney General

By:

Matthew Thiman
Trial Attorney
Civil Rights Division, United States Department of Justice

22