IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:23-cr-92 |
| | ) | |
| KULBIR KAUR, | ) | |
| also known as "LOVELY," | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## **GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Kulbir Kaur, together with her husband, defendant Harmanpreet Singh (collectively, "defendants"), robbed B.S., defendant Singh's minor cousin, of three years and three months of his adolescence when they lured him to the United States with false promises to enroll him in school. Rather than enrolling B.S. in school as promised, the defendants forced B.S. to work in their gas station, compelling him to clean, cook, stock shelves, fry chicken, and manage store records—for at least twelve hours per day, virtually every single day—all to satiate their own greed.

To keep B.S. in servitude, the defendants worked together to further rob B.S. of his dignity and to create a climate of fear. For her part, defendant Kaur, among other things: (1) forced B.S. into a humiliating marriage with her despite being more than twice B.S.'s age and married to B.S.'s cousin; (2) used the marriage to threaten confiscation of B.S.'s parents' property in India if B.S. did not continue to work; (3) confiscated and retained B.S.'s travel documents and threatened him with legal consequences from being "illegal" once B.S.'s travel documents expired; (4) screamed at and berated B.S.; and (5) restricted B.S.'s access to clean bedding. Working in tandem with

defendant Kaur, defendant Singh handled the physical elements of the coercion: (1) slapping, kicking, and pulling B.S.'s hair; and (2) threatening to kill B.S. with a firearm if B.S. did not comply on multiple occasions (including by pointing the firearm at B.S.'s head). Both defendants abandoned B.S. to sleep for multiple nights in a row at the gas station, commanded B.S.'s exhaustive labor (often at late hours of the night) in the Lovely Market, restricted his access to food and medical care, isolated B.S. from his family, and surveilled every interaction that B.S. had at the Lovely Market.

Human trafficking is among the most heinous crimes that come before this Court and is deserving of the most serious punishment. The United States respectfully submits that a sentence of 168 months' imprisonment, at the top of the recommended Guidelines sentencing range, is sufficient but no greater than necessary to meet the purposes of 18 U.S.C. § 3553(a).

## I.    PROCEDURAL HISTORY

On July 19, 2023, a grand jury in the Eastern District of Virginia returned a seven-count Indictment charging the defendants with: (Count 1) Conspiracy to Commit Forced Labor, in violation of 18 U.S.C. §§ 1594(b) and 1589; (Count 2) Forced Labor, in violation of 18 U.S.C. §§ 1589, 1594(a), and 2; (Count 3) Harboring an Alien for Financial Gain, in violation of 8 U.S.C. § 1324 and 18 U.S.C. § 2; (Count 4) Document Servitude, in violation of 18 U.S.C. §§ 1592 and 2; (Count 5) Unlawful Conduct with Respect to Immigration Documents, in violation of 18 U.S.C. §§ 1597 and 2; (Count 6) Conspiracy to Commit Bankruptcy Fraud and Make Fraudulent Transfers in Contemplation of Bankruptcy, in violation of 18 U.S.C. § 371; and (Count 7) Fraudulent Transfers in Contemplation of Bankruptcy, in violation of 18 U.S.C. §§ 152(7) and 2. *See* ECF No. 29. Both defendants were arraigned on the Indictment on August 14, 2023. *See* ECF No. 39. The Court severed Counts 6 and 7 on October 11, 2023, *see* ECF No. 88, and trial commenced on Counts 1 through 5 on January 5, 2024, *see* ECF No. 186.

2

On January 19, 2024, after a two-week trial, a jury sitting in the Eastern District of Virginia returned a guilty verdict as to both defendants on all counts (Counts 1 through 5). *See* ECF Nos. 199, 200. Following the verdict, the government moved to dismiss Counts 6 and 7, and the Court ordered those counts dismissed without prejudice. *See* ECF No. 203. The Court scheduled sentencing for May 8, 2024.

## II.   PRESENTENCE INVESTIGATION REPORT

The Presentence Investigation Report (PSR) reflects that the defendant's applicable Guidelines range is 135 to 168 months' imprisonment, based on an adjusted offense level of 33 and a criminal history category of I. *See* ECF No. 227 ("PSR") ¶¶ 113-14. The government has no remaining objections or corrections to the PSR.

*Uncontested Guidelines Provisions*

The Probation Office correctly applied the following Guidelines provisions, which have garnered no defense objections:

(1) The base offense level is 22, pursuant to Section 2H4.1(a)(1). PSR ¶ 74; U.S.S.G. § 2H4.1(a)(1).

(2) The defendant received a 3-level increase because she held victim B.S. in a condition of peonage or involuntary servitude for more than 1 year. PSR ¶ 76. The evidence showed that the defendants brought B.S. to the defendants' house in North Chesterfield, Virginia, in February 2018. B.S. eventually escaped in May 2021, well past the one-year mark necessary for a three-level increase.

(3) The defendant received a 2-level increase for having committed additional felonies during the commission of the forced labor offenses. PSR ¶ 77; U.S.S.G. § 2H4.1(b)(4)(B). The jury found the defendant guilty of Harboring an Alien for Financial Gain, which is a felony crime. *See* ECF No. 199.

(4) The defendant received a two-level increase because victim B.S. was a vulnerable victim. PSR ¶ 78; U.S.S.G. § 3A1.1(b)(1). B.S. was a minor when the defendants took him from his family in India, and, after transporting B.S. to the United States, the defendants took possession of B.S.'s passport and visa, isolated him in their home and store, and harbored him without legal status in violation of immigration laws for their own financial gain.

*Contested Guidelines Provision*

The defendant has objected to the application of the 4-level enhancement for the use of a dangerous weapon, pursuant to U.S.S.G. § 2H4.1(b)(2)(A); the government maintains that the enhancement is properly applied. The application notes describe that a dangerous weapon is used either where the "firearm [is] discharged" or where the "firearm . . . [is] otherwise used." U.S.S.G. § 2H4.1 cmt. n.1. The Guidelines define "otherwise used" as any conduct that "did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." U.S.S.G. § 1B1.1 cmt. n.1(J).

The Fourth Circuit has described that a firearm is "otherwise used" when "use of the gun goes beyond brandishing and becomes actually menacing," even where the firearm is not discharged. *See United States v. McNeil*, 539 F. App'x 190, 191 (4th Cir. 2013) (upholding the application of an enhancement for otherwise using a firearm where a codefendant pointed a firearm at store clerks in the course of a robbery and demanded money); *United States v. Shull*, 232 F. App'x 367, 368 (4th Cir. 2007) (holding that the fact that the defendant "had displayed and pointed a pistol at a bank teller" in the course of a robbery meant that "he had 'otherwise used' a firearm . . . warranting" a sentencing enhancement). Circuit courts have consistently agreed that a defendant otherwise uses a firearm when the defendant uses "a firearm to make an explicit or

implicit threat against a specific person," even just by pointing a firearm at a specific person. *United States v. Cover*, 199 F.3d 1270, 1278 (11th Cir. 2000); *see, e.g.*, *United States v. Orr*, 312 F.3d 141, 145 (3d Cir. 2002) (finding that "'[p]ointing a weapon at a specific person or group of people, in a manner that is explicitly threatening, is sufficient to make out 'otherwise use' of that weapon,'" (quoting *United States v. La Fortune*, 192 F.3d 157 (1st Cir. 1999))); *United States v. Bolden*, 479 F.3d 455, 463 (6th Cir. 2007) (describing that "pointing a firearm at an individual coupled with a demand of that individual constitutes otherwise using a firearm" and noting that a verbalized threat is not necessary to constitute otherwise using a firearm); *United States v. Warren*, 279 F.3d 561, 563 (7th Cir. 2002) ("We have affirmed 'otherwise used' adjustments when pointing a weapon at a specific victim created a personalized threat of harm.").

Here, defendant Singh's conduct went beyond merely brandishing the firearm to intimidate B.S. Defendant Singh repeatedly pointed the firearm at B.S. to coerce B.S. in the forced labor scheme. *See, e.g.*, PSR ¶ 58 (In January 2021, after threatening to kill B.S. for not showing up to work, defendant Singh "took B.S. to a bedroom and pointed a revolver in B.S.'s face" the following day—all in the presence of defendant Kaur, who pulled defendant Singh off B.S. but allowed and facilitated B.S.'s work thereafter.); PSR ¶ 61 (In May 2021, to impede B.S.'s escape and find out where B.S. would be going after his escape, defendant Singh "again pointed his firearm at B.S." and demanded to know where he was going.).

Defendant Singh also used the firearm to threaten B.S. on other occasions (without pointing the firearm at B.S.). In February 2021, defendant Singh threatened B.S. with the firearm when the defendants learned that B.S. had told a Lovely Market customer not to give him any more gratuities. Defendant Singh began loading his revolver as he confronted B.S. about not taking customers' tips to give to the defendants. *See* Trial Transcript ("Tr.") 589-598; Gov. Trial Ex. 30;

5

PSR ¶ 59. As defendant Singh was loading the firearm and confronting B.S. for not taking tips for the store, B.S. "thought he was going to – to kill [him]" and thought "[h]e was going to shoot [him] for $5." Tr. 596. Defendant Kaur stored a video of this incident on her phone and allowed and facilitated B.S.'s work thereafter.

On each of these occasions, defendant Singh is doing more than merely displaying the firearm—he is actively loading or pointing the firearm at B.S., at least implicitly threatening B.S., and making certain demands of B.S.: to work, to hand over tip money, and to impede B.S.'s escape.

Furthermore, defendant Kaur, for her part, does not distance herself from the gun-related misconduct within the jointly undertaken criminal activity simply because she was not the gunman. Defendants Kaur and Singh played different roles in the criminal scheme—defendant Kaur often provided strategic direction and made verbal threats and defendant Singh provided "muscle" or more physical forms of coercion. While defendant Singh was the defendant that used the revolver as part of the coercive scheme, defendant Singh's coercive conduct is equally applicable to defendant Kaur because it is relevant conduct attributable to her under the Guidelines. *See* U.S.S.G. § 1B1.3(a)(1)(A-B). The application of specific offense characteristics and adjustments is determined, "in the case of a jointly undertaken criminal activity," on the basis of "all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity . . . that occurred during the commission of the offense of conviction." *Id.*

Defendant Singh's coercive use of the revolver to compel B.S.'s labor is "within the scope" of the forced labor scheme and "in furtherance" of the activity as use of a prohibited means is an element of forced labor, *see* 18 U.S.C. § 1589(a)(1-4), and defendant Singh's use of the firearm was one of many prohibited means the defendants used to compel the victim's labor. Defendant

Kaur also knew that a gun was being used to threaten B.S. and that defendant Singh was pointing

the gun at B.S. to coerce him into compliance as part of their joint coercive scheme—she was

present for at least the first use of the revolver and possessed a video of defendant Singh using the

revolver against B.S. on the second occasion on her cellular telephone. *See United States v.*

*Goodall*, 741 F. App'x 910, 914 (4th Cir. 2018) (holding that the district court properly applied a

codefendant's "use of a dangerous weapon" to the defendant under Section 1B1.3 as it was

"reasonably foreseeable and within the scope of [a kidnapping] conspiracy"). While defendant

Kaur did intercede to stop defendant Singh from further harming B.S. with a gun on one occasion,

she failed to put a stop to B.S.'s coerced labor thereafter and knowingly reaped the benefits of

B.S.'s continued coercion with a gun. As such, defendant Singh's coercive gun misconduct is

equally applicable to defendant Kaur as relevant conduct and was one aspect of the defendants'

joint criminal scheme. *See* U.S.S.G. § 1B1.3(a)(1)(B).

* * *

The United States respectfully requests that this Court adopt the PSR's facts and Guidelines

calculations and sentence the defendant to 168 months of imprisonment, at the top of the

recommended range.

## III.    ARGUMENT IN SUPPORT OF A GUIDELINES SENTENCE

The Supreme Court has declared, "[a]s a matter of administration and to secure nationwide

consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United*

*States*, 552 U.S. 38, 41 (2007). This Court, therefore, "must first calculate the Guidelines range,

and then consider what sentence is appropriate for the individual defendant in light of the statutory

sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference

to the latter." *Nelson v. United States*, 555 U.S. 350, 351 (2009). When the court, in consideration

of the Section 3553 factors, imposes a non-Guidelines sentence, it must give serious consideration

to the extent of the deviation and provide an explanation "to allow for meaningful appellate review and to promote the perception of fair sentencing." *United States v. Diosdado-Star*, 630 F.3d 359, 365 (4th Cir. 2011) (internal quotation marks omitted).

Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense as well as the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2); *United States v. Shortt*, 485 F.3d 243, 247 (4th Cir. 2007) (noting that subsection (a)(2) of section 3553 includes "factors that a court must consider in determining a particular sentence").

In this case, in light of the nature and circumstances of the offense and the need to reflect the seriousness of the offense and afford adequate deterrence, the government respectfully recommends that the defendant's conduct, considered in conjunction with the sentencing factors set forth in 18 U.S.C. § 3553(a), calls for a sentence at the top end of the applicable sentencing Guidelines range. Such a sentence is sufficient but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a).

### A.  Nature and Circumstances of the Offense

The defendants conspired and worked together to employ a coordinated scheme to compel defendant Singh's minor cousin to work at their gas station and convenience store for over three years—all for their own profit and to avoid having to work at the store themselves. Both defendants consistently participated and played complementary roles in the criminal conduct throughout the

charged time period, and the "nature and circumstances of the offense" warrant a sentence at the top of the applicable Guidelines range.

### i. The defendants targeted B.S.'s vulnerabilities and used false promises to recruit B.S. to come to the United States.

The defendants worked together to target and prey upon the vulnerabilities of defendant Singh's minor cousin, B.S., throughout their forced labor scheme. B.S. grew up in Khurdan, a small village, in Punjab, India, and, while B.S. did occasionally help on the family farm, he never otherwise worked while growing up in India. PSR ¶ 18; Tr. 230, 234. In 2017, while still in school in India, B.S. obtained a B-1/B-2 nonimmigrant visa and traveled to the United States as part of a school trip, but, other than that short trip, B.S. had never before been to the United States and was not familiar with the country. PSR ¶ 16; Tr. 236-37. In February 2018, B.S. was several months from finishing the equivalent of high school in India, but he wanted to go to college in the United States because B.S. believed that the United States offered him better educational opportunities. Tr. 246-47. B.S. was also, according to his legal date of birth, only 16 years old in February 2018. Tr. 256.

In February 2018, the defendants exploited B.S.'s youth, his unfamiliarity with the United States, his desire to get a better education, and their position of trust as B.S.'s family members by recruiting B.S. to come to the United States using the false promise that they would help enroll B.S. in school and get a student visa. *See* Tr. 245-47. When B.S.'s parents were reluctant to allow B.S. to travel to the United States before finishing high school, defendant Singh talked with B.S.'s father and convinced him to allow B.S. to travel to the United States—they agreed that, if B.S. did not find a school, he would return to India. Tr. 247, 251. For her part, defendant Kaur also helped convince B.S.'s parents of the wisdom of coming to America before completing high school to prevent having to "retake Indian classes in America." PSR ¶ 23. B.S. and B.S.'s father both

testified that, in these initial conversations in India, neither defendant ever said anything about the Lovely Market or about B.S. working when he came to the United States. Tr. 250. The defendants perpetuated a ruse to lure B.S. far away from his parents, his family, and a country that he was familiar with and isolate him in their home in North Chesterfield, Virginia, and in the Lovely Market to make him subject to their coercive scheme.

### ii. Defendant Kaur confiscated B.S.'s passport and visa, and the defendants refused to return his immigration documents for over three years.

Defendant Kaur made B.S. even more vulnerable to their coercive scheme by taking B.S.'s immigration documents and restraining him in the United States. Immediately after passing through customs screening while still inside the airport, defendant Kaur continued the defendants' ruse and told B.S. that she needed his passport "for the school" and because he was "too young" and did not "want [him] to lose it." Tr. 261; PSR ¶ 26. Defendant Singh also saw B.S. give defendant Kaur B.S.'s passport. PSR ¶ 26. That would be the last time that B.S. possessed his passport and visa until the day in May 2021 when he finally escaped from the defendants. Tr. 324.

### iii. The defendants imposed relentless work hours and degrading living conditions.

Starting at 6:00 a.m. B.S.'s first morning in the United States, defendant Singh took B.S. to the store and compelled him to work, despite B.S.'s objections. PSR ¶ 28. Over the ensuing three years and three months, the defendants both forced B.S. to work roughly 12 to 15 hour days at the Lovely Market; B.S. received two days off in this entire time period when he was too sick to work. Tr. 265; PSR ¶ 29 (detailing the work that B.S. undertook "at the Lovely Market at both defendants' direction"). In the beginning, the defendants had B.S. work all day at the Lovely Market from opening until closing—roughly 7:00 a.m. to 10:00 p.m. Tr. 283, 369. B.S. was responsible for all of the store's operations, including cleaning, working in the kitchen to prepare fried chicken, serving as cashier, stocking inventory, and managing store records. Tr. 355-67.

Eventually, several of the store customers noticed how much B.S. was working and his young age. Tr. 369. When the defendants found out the customers were noticing B.S.'s prolonged hours at the Lovely Market, the defendants had a discussion about changing his work hours to avoid unwanted scrutiny. Tr. 369-70. Defendant Kaur, to conceal the fact that B.S. was working such long hours, told defendant Singh to work the counter of the Lovely Market from 7:00 a.m. to 11:00 a.m. and have B.S. work from 10:00 a.m. or 11:00 a.m. to 10:00 p.m. Tr. 283, 369-70. Even on days when he started at 11:00 a.m., however, the defendants made B.S. go to the store with defendant Singh at 7:00 a.m. and rest on a mattress that defendant Singh put in the store's back room until his shift started. Tr. 368-70, 397. Once B.S.'s shift was over at 10:00 p.m., he closed the store, and defendant Singh would drive B.S. back to the defendants' house. Tr. 267, 370. Defendant Singh, however, told B.S. that he was not allowed to close the store if there were any customers still using the gambling machines, so B.S. often had to stay even later than 10:00 p.m.—one night he had to keep the store open until 5:00 a.m. the next day. Tr. 361-62.

Beginning in 2018 and continuing through 2021, defendant Singh and defendant Kaur were both involved with the store and consistently gave B.S. instructions on what to do and how to operate the store. Tr. 371. Both defendants gave B.S. numerous orders at the store through WhatsApp—both in individual chats and a group chat named "Store" that included both defendants and B.S. *See* Gov. Trial Exs. 23A, 24A, 25A. The defendants relentlessly directed B.S. on daily store operations and required B.S. to send pictures of daily store reports and accounting. *See id.*; Tr. 371-94, 509-42. The messages also came at all hours of the day and night, demonstrating the extensive hours that B.S. was compelled to work and both defendants' control of B.S.'s labor. *See id.*; PSR ¶ 51.

The long work hours that the defendants imposed left B.S. almost completely isolated from other people besides interactions he had while working at the Lovely Market, and the defendants further isolated and monitored B.S. while he was working at the store. Defendant Singh told B.S. not to tell customers his full name or date of birth, Tr. 315, 548; PSR ¶ 47(b), and the defendants placed audio and video surveillance equipment throughout the Lovely Market and monitored B.S. at the store, Tr. 367-68, 550-58; PSR ¶¶ 47(b), 51, 59.

The defendants also imposed degrading living conditions during the minimal hours that B.S. was not working at the store. Defendant Kaur limited B.S.'s access to food—she would leave food for B.S. in the kitchen for B.S. to eat when he returned home after closing the store. Tr. 269-70. On one occasion when B.S. took food from the refrigerator, defendant Kaur yelled at B.S., claiming that he had eaten defendant Kaur's daughter's food. *Id.;* PSR ¶ 46. The defendants then installed a camera in the kitchen area and tied a rope around the pantry door limiting his access to foods in the pantry. Tr. 271-72; PSR ¶ 46. The defendants also limited B.S.'s use of his cellular telephone and communications by only activating a cellular telephone plan when they were traveling and turning off the wireless network at night so that B.S. could not use his phone. Tr. 273-74; PSR ¶ 47(a).

The defendants never provided B.S. medical treatment or dental care during the more than three years he spent working at the Lovely Market, despite multiple incidents where B.S. needed medical care. Tr. 568-576; PSR ¶ 52. On one occasion, B.S. was suffering from a severe toothache. Tr. 568-71; PSR ¶ 52. Rather than take B.S. to a dentist, however, the defendants had him take old pain medication that had previously been prescribed to defendant Singh, and defendant Kaur yelled at B.S. for asking for more medicine when his tooth was still hurting overnight. Tr. 568-71. On a separate occasion, B.S. burned his hand while frying chicken at the Lovely Market. Tr. 571-72.

The defendants again refused to transport B.S. to receive medical treatment. Tr. 573; PSR ¶ 52. B.S. had to smear toothpaste on his hand just to make the burn feel cooler. Tr. 572-73; PSR ¶ 52.

Starting just a few months after the defendants brought B.S. to the United States, they forced B.S. to sleep at the store on multiple occasions, staying in a small office in the back of the store where defendant Singh put a mattress on top of a desk. Tr. 397, 474-77; PSR ¶ 45. When the defendants did not feel like coming to pick B.S. up or when they traveled, they would leave him to sleep at the store, telling him that it would only be for a few days. Tr. 474-77. The defendants would then leave him there for up to a week without access to a shower, clean clothes, or regular food—B.S. had to eat snacks from the store shelves to sustain himself. *Id.*; PSR ¶ 45. Defendant Kaur even refused to allow B.S. to wash the sheet from the mattress at the store in the defendants' home washer—B.S. was only able to wash the sheet a single time between 2018 and 2021. Tr. 477-78; PSR ¶ 45. On one occasion, B.S. was confined to the small office and not able to use the restroom for hours because defendant Singh remotely set the store alarm. Tr. 491-93.

The defendants also restricted B.S.'s financial resources by never placing B.S. on the payroll for the Lovely Market and never paying B.S. any salary or wages directly. Tr. 394-96; PSR ¶ 50. For the first year that B.S. worked at the store, the defendants did send irregular Western Union money transfers to B.S.'s mother's bank account, but even those payments stopped after the first year. *Id.*; PSR ¶ 50 (detailing $4,017 in payments made by defendant Singh and $4,915 payments made by defendant Kaur via Western Union). The defendants also, ultimately, did not allow B.S. to keep any tips that he received while working at the store. Tr. 588-90; PSR ¶ 59.

### iv. Defendant Singh used consistent physical abuse to keep B.S. and compel him to continue working.

Whenever B.S. confronted the defendants about not being enrolled in school, about being forced to work at the Lovely Market, or about returning his documents so that he could return to

India, the defendants consistently refused to return his passport and visa, continued their ruse of seeking school enrollment for B.S., threatened B.S., and physically abused him.

Starting just three weeks after the defendants brought B.S. to the United States, B.S. requested his passport from defendant Singh in order to leave the United States and return to India because the defendants were not helping B.S. look for school opportunities.  In response, defendant Singh became upset and kicked B.S. Tr. 276-77. Defendant Singh physically abused B.S.—pulling his hair, slapping his face, kicking him, grabbing his shoulders and shaking him—consistently, every six months or so, throughout the time that the defendants compelled B.S. to work at the Lovely Market. Tr. 280-81. For instance, in February 2019, B.S. again raised the issue of his passport expiring and told the defendants that they were overworking and exploiting him, and defendant Singh pulled B.S.'s head up by his hair and slapped him while B.S. cried. Tr. 297-99; PSR ¶ 38. In July 2019, defendant Singh again slapped B.S. when he requested his passport. Tr. 320-22. While these instances of physical abuse did not cause any lasting physical injuries, defendant Singh's abuse was demeaning, degrading, and ensured that B.S. continued working and did not immediately again ask to leave.

While defendant Kaur did not commit any of the physical abuse against B.S. herself, she was present on multiple occasions when defendant Singh assaulted B.S., and she "verbally harassed B.S."—B.S. testified that her "words were like a bullet." Tr. 281; PSR ¶ 44. Defendant Kaur also supplemented defendant Singh's abuse with coercive measures of her own that were just as impactful on B.S. as defendant Singh's more physical means.

### v.  The defendants compelled B.S. to marry defendant Kaur, and defendant Kaur used that marriage to repeatedly threaten B.S. to compel him to stay.

When B.S. again asked defendant Singh to return his passport in July 2019, defendant Singh physically assaulted B.S., and the defendants then told B.S. for the first time that they had

divorced and that B.S. would now marry defendant Kaur—the defendants continued the ruse that the marriage would help them enroll B.S. in school. Tr. 320-23; PSR ¶ 41. At the time, defendant Kaur was twenty years older than B.S. and, in B.S.'s mind, still his cousin's wife; B.S. pleaded with the defendants, promising that he would "be nice to customers" and that he would work if they just would not make him marry defendant Kaur. Tr. 324-27; PSR ¶ 41. Defendant Singh, in response, threatened B.S., telling him that he would marry defendant Kaur or defendant Singh would "see [him] [the next] night" and beat him again. Tr. 326-27; PSR ¶ 42.

Shortly after the defendants forced B.S. to marry defendant Kaur, defendant Kaur requested B.S.'s birth certificate and copies of B.S.'s parents' property titles from B.S.'s family in India, under the pretext that such documents were needed to enroll B.S. in college. Tr. 336-40; PSR ¶ 43. After B.S.'s family sent the documents, defendant Kaur then told B.S. that he could not be enrolled in school, and defendant Kaur began using the documents provided by B.S.'s family to repeatedly threaten B.S., telling him that, if he ran away while the defendants traveled to India, she would take his parents' properties now that they were married. Tr. 341-43; PSR ¶ 43. Defendant Kaur also used the sham marriage by threatening B.S. that she would falsely report him, her "husband," to the police for harassment if he left. Tr. 343. Defendant Kaur's marriage to B.S. and her repeated threats to seriously harm him and his parents if he left the defendants were among the most coercive means that the defendants employed to ensure that B.S. continued working—B.S. described how the marriage and these threats still left him in fear even years later when he escaped. Tr. 615-16.

**vi. Defendant Kaur extended B.S.'s visa, and, after the end of that extension period, both defendants threatened B.S. using his immigration status.**

In July 2018, when B.S.'s tourist visa was about to expire, B.S. again requested his passport to return to India. Tr. 282-83. Defendant Kaur dismissed B.S.'s request by telling him the new

school semester would begin in September, and defendant Kaur, instead of returning his passport as he wanted, took B.S. to an immigration attorney in July 2018 to extend his tourist visa for another six months. Tr. 284-86; PSR ¶ 45. Defendant Kaur listed herself as B.S.'s interpreter on the immigration paperwork despite B.S. speaking fluent English and took all the necessary steps for the visa extension in order to keep B.S. in the country. Tr. 286-94, 311-13; Gov. Trial Ex. 11. It was defendant Kaur who instructed B.S. to sign this visa extension paperwork, over B.S.'s objections, while only providing him the signature pages to review. Tr. 289-91; PSR ¶ 34. It was defendant Kaur who lied repeatedly on the visa extension application, including by signing a false affidavit attesting that the purpose of the visa extension was to allow B.S. to travel and celebrate Christmas in the United States. Tr. 292-94; PSR ¶ 36. B.S., a member of the Sikh faith, does not celebrate Christmas. Tr. 293; PSR ¶ 35.

In January or February 2019, B.S. again requested his passport to return to India, knowing the passport would soon expire and would become invalid. Tr. 297-300; PSR ¶ 39. The defendants again told him not to worry because they would apply for asylum to keep B.S. in the United States. Tr. 302. B.S. did not believe that he was in any danger in his hometown in India, but defendant Kaur nevertheless took B.S. to an immigration attorney and told B.S. to lie to seek asylum in the United States. Tr. 303, 318-20; PSR ¶ 40. Ultimately, B.S.'s passport expired in March 2019. Tr. 306-07; Gov. Trial Ex. 5. As B.S.'s passport and visa were expiring, the defendants then began using the expiration of those immigration documents to also threaten B.S. regarding his illegal immigration status. Tr. 299, 314, 315-17. Defendant Singh, with defendant Kaur present, told B.S.: "Your visa is going to expire. Even if I kill you right now no one would care about it." Tr. 299, 314; PSR ¶ 38. Defendant Kaur told B.S. that, without status, B.S. would be the one to get in trouble and "go to jail," not the defendants, if B.S. went to law enforcement. Tr. 317; PSR ¶¶ 38-

39. B.S. described in his victim impact statement how he "thought the Government was cruel because the defendants convinced [him] that if [he] went anywhere . . . [he] would be arrested and imprisoned for not having a legal status in the United States"; after the defendant's threats, it took "a long time [for B.S.] to start to trust people again." B.S.'s Victim Impact Statement 5, ECF No. 227-1.

### vii.   Defendant Singh used a revolver to threaten B.S. and compel him to continue working.

In January 2021, B.S. worked every day at the Lovely Market for approximately 16 hours a day while defendant Singh traveled to India. Tr. 500, 581; PSR ¶ 57. During that month, B.S. got sick and was not able to go to work—just the second day that B.S. had off since March 2018. Tr. 579, 581. After defendant Singh found out that B.S. was not at the store, he called B.S. and threatened him to get him back to work, telling him: "I'll be back by tomorrow. The first thing I will do, I will kill you." Tr. 581; PSR ¶ 58. When defendant Singh returned from India, he confronted B.S. about not working that day and pointed a revolver at B.S.'s head. Tr. 583-84; PSR ¶ 58. Defendant Singh, while threatening him with the revolver, asked B.S.: "Why are you being a pain in the ass? If you don't work, who going to work?" Tr. 581-84. While defendant Kaur was not the one using the revolver, she came into the room during this incident to intervene and knew that defendant Singh threatened B.S. with the firearm. Tr. 582; PSR ¶ 58.

Just a month later in February 2021, Defendant Singh again threatened B.S. with the same firearm when the defendants learned that B.S. had told a Lovely Market customer not to give him any more gratuities because the defendants were confiscating his tip money—defendant Singh began loading his revolver as he confronted B.S. about the messages. Tr. 589-598; PSR ¶ 59. Defendant Kaur had a video of defendant Singh threatening B.S. with the revolver saved on her cellular telephone. *See* Gov. Trial Exs. 29, 30.

In May 2021, when B.S. was insisting on finally leaving the defendants, defendant Singh, for the third time, pulled out his revolver at the Lovely Market and pointed it at B.S., demanding to know where B.S. was going. Tr. 620; PSR ¶ 61. Neither defendant allowed B.S. to leave without trying to continue their coercive scheme—defendant Kaur came to the store and again threatened B.S., telling him: "You think you can leave from here, but I'm telling you you will be back here. I won't let you leave peacefully." Tr. 621; PSR ¶ 61.

### viii. Defendant Kaur forged documents to subvert the truth, and both defendants repeatedly lied to law enforcement to conceal their criminal activity and consistently refuse to accept responsibility.

After escaping, B.S. spoke with a lawyer about what had happened, and the lawyer drafted and mailed a demand letter to the defendants demanding B.S.'s unpaid wages on June 24, 2021. Tr. 634-37; *see* Gov. Trial Ex. 21A. Immediately after receiving that letter, defendant Kaur began to fabricate a series of fake documents that were recovered from the defendants' house in the December 2021 search warrant. PSR ¶ 63. The evidence at trial demonstrated that defendant Kaur handwrote a series of monthly paystubs purportedly showing that B.S. was paid for each month between January 2019 and December 2020. *See* Gov. Trial Ex. 21B. The paystub template, however, was not printed from defendant Kaur's computer until July 2021, well after B.S. had left and less than a week after the defendants had received the demand letter from B.S.'s lawyer. *See* Gov. Trial Ex. 56D. Defendant Kaur also composed multiple drafts of a letter on her computer purporting to be written by B.S. and describing that he wanted to work at the gas station, worked reasonable hours, and was paid for his labor. *See* Gov. Trial Exs. 21C, 56D. The letter was backdated to March 2019, but the letter drafts were printed from defendant Kaur's computer just several hours before the paystub template in July 2021. *See* Gov. Trial Ex. 56D. These documents were recovered by law enforcement several months later, in December 2021, before defendant

Kaur needed to present them in any civil or criminal proceeding, but her fabrication of the documents right after receiving the letter from B.S.'s lawyer shows at least her intent to obstruct and impede any civil investigation into the defendants' conduct. To the same point, defendant Kaur also attempted to hack into B.S.'s phone and computer after B.S. escaped. Tr. 638-39; PSR ¶ 62.

Both defendants' statements to law enforcement also constituted lies to conceal their own criminality; they both lied about B.S.'s labor at the Lovely Market and the defendants' continued relationship and living situation.[1] In his interview, defendant Singh repeatedly stated that B.S. never worked at the Lovely Market at all and never slept at the store. *See* Gov. Trial Ex. 55. Defendant Kaur told law enforcement that she had no idea whether B.S. worked at the Lovely Market, despite directing facets of B.S.'s labor. PSR ¶ 66. Kaur further implausibly claimed that she and B.S. were "in love" to explain their marriage. PSR ¶ 66.

At no point has either defendant accepted any measure of responsibility for their conduct, and even after the jury found both defendants guilty of all of the forced labor counts, defendant Kaur has continued to deny her guilt and has publicly presented a version of events that is entirely belied by the trial record. Indeed, after the jury verdict and less than a month after the Court released defendant Kaur to home confinement to arrange for the transfer of custody of her minor children in advance of sentencing, *see* ECF No. 211, defendant Kaur took the opportunity to do a public, podcast-style interview that was over two hours long and posted to YouTube. In that interview, defendant Kaur publicly disseminated B.S.'s full name and date of birth; referenced the contents of certain discovery materials protected from disclosure by the Court's protective order, *see* ECF No. 20; and went on at length about how she never lived with defendant Singh and B.S.

---

[1] The defendants were being investigated and were ultimately indicted for a parallel bankruptcy fraud that they committed at the same time as the forced labor scheme. The defendants' bankruptcy fraud was predicated on their purported separation and divorce, and so the defendants' statements were designed to conceal both criminal schemes.

and only helped with the Lovely Market briefly in 2020. *See* Attachment 1 (summary translation of interview). Defendant Kaur, even after trial, is actively still denying her guilt and publicizing a fabricated version of events. B.S. described, in his victim impact statement, how this video was "shared . . . with [his] community back in India," and he now has to "avoid the calls from [his] closest friends because it is too painful to retell and relive what [he] experienced" in continuing to defend himself against defendant Kaur's "video of lies." B.S.'s Victim Impact Statement 2, ECF No. 227-1. Even though B.S. escaped from the defendants and trial has ended, defendant Kaur disseminated this video and has continued to harm B.S. *See id.*

### B.  History and Characteristics of the Defendants

The defendant's history and personal characteristics support a Guidelines range sentence and do not establish any extraordinary circumstances warranting either a downward departure or variance from the applicable Guidelines range. The PSR does not reveal anything remarkable about the defendant's background that explains or mitigates the serious offense conduct. While the defendant reported certain hardship in the past—including her claims to have been abused by her former husband for two years until his deportation in 2004, PSR ¶¶ 95, 96—defendant Kaur did not report any mitigating factors since at least the time of the defendants' marriage in early 2014. Since that time, defendant Kaur has had employment, children, stable housing, and supportive family living in the Richmond, Virginia area. The PSR does not report any history of significant mental or emotional health concerns or substance abuse issues.

Furthermore, the defendant's family ties do not warrant a departure from a Guidelines sentence. "Family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6; *see United States v. Wilson*, 114 F.3d 429, 433-34 (describing how the "Commission discouraged departure on the basis of family ties and responsibilities" and finding that such a "departure pursuant to § 5H1.6 . . . is permitted only upon

a finding that the defendant's family ties or responsibilities are extraordinary"). The defendants have two minor children, but this type of family responsibility is not extraordinary. *See, e.g.*, *United States v. Weddle*, 30 F.3d 532, 541 (4th Cir. 1994) (describing how Fourth Circuit "precedent . . . does not allow the consideration of a defendant's status as a single, custodial parent to create an extraordinary circumstance justifying downward departure"); *United States v. Brand*, 908 F.2d 31, 33-34 (4th Cir. 1990) (reversing the district court's downward departure and holding that separation of the defendant, who was the "sole, custodial parent" of two young children, was not extraordinary, even where the children would have to be "placed with 'blood strangers'"). Furthermore, the imposition of a Guidelines sentence in this case would not render the children without care. Indeed, the defendants have several family members in the area, including defendant Kaur's brothers and parents, and the defendants have already transferred custody of their two younger children to their adult daughter. Therefore, the defendants' family ties, when balanced with the other sentencing factors—including the nature and circumstances of the offense—do not warrant deviating from a Guidelines sentence.

Finally, while defendant Kaur only has one prior theft-related conviction, the Guidelines range already factors in this criminal history. Therefore, criminal history also does not warrant a downward departure. *See* U.S.S.G. § 4A1.3(b)(2)(A) (prohibiting a "departure below the lower limit of the applicable guideline range for Criminal History Category I").

### C. Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Provide Just Punishment, and Afford Adequate Deterrence

The defendants in this case violated a fundamental and foundational right afforded people in the United States—the Thirteenth Amendment's guarantee that no person shall be subject to compelled servitude. U.S. CONST. amend. XIII, § 1. The defendants violated that fundamental right

afforded to B.S. every day for a period of three years and three months, making him work extreme hours and using a multitude of coordinated coercive measures.

The work that the defendants compelled B.S. to perform was extreme, relentless, and degrading. The defendants compelled B.S. to work virtually every day for at least twelve hours with no breaks, weekends, or holidays. B.S. was also frequently the only employee at the store and was required to clean, stock inventory, cook food, run the cash register, manage the gambling machines and lottery services, complete store records, handle the operation of the gas pumps, and complete any other task that the defendants demanded on a daily basis. The Guidelines range accounts for a victim being held in a condition of involuntary servitude for periods of 30 or more days, between 180 days and one year, or for more than one year, *see* U.S.S.G. § 2H4.1(b)(3), but, here, the defendants made B.S. work at the Lovely Market virtually every day for three years and three months and complete an overwhelming number of labors and services each day. This duration of labor should push the Court towards the high end of the Guidelines range.

The defendants employed a calculated scheme and employed every coercive measure available to them to keep B.S. in the United States and compel him to continue those extreme labors. Defendant Kaur immediately took B.S.'s immigration documents so that he could not leave. When B.S. first asked for his documents back and tried to leave, the defendants continued to falsely promise that they would enroll him in school, and defendant Singh started physically abusing B.S. Both defendants wore B.S. down with extensive work hours and degrading living conditions, constantly surveilling and monitoring him and even making him sleep in the store office at times. When B.S.'s visa was about to expire, defendant Kaur extended his visa for another six months rather than letting him return to India. After B.S.'s passport and visa expired, both defendants leveraged his illegal status to keep him in the country by threatening him based on that status.

When the defendants wanted to take a trip to India together, they imposed even more extreme measures of control. Defendant Singh abused B.S. until he agreed to marry defendant Kaur, and defendant Kaur used that marriage to threaten B.S.'s parents and threaten to falsely report B.S. to the police. Finally, when B.S. tried to take just his second day off in nearly three years, defendant Singh threatened B.S. with a revolver and continued using that firearm to keep B.S. at the store. Each time that B.S. tried to leave and be free of the defendants' compelled servitude, the defendants confronted him with yet another prohibited means of coercion to compel him to stay and continue working.

Especially considering the seriousness of the offense, a Guidelines range sentence is also necessary to afford adequate deterrence. The defendants did not voluntarily allow B.S. to leave, *see* Tr. 617-21, and, after B.S. was finally able to escape, the defendants then fabricated documents and lied to law enforcement to conceal their crimes, did not accept responsibility for their conduct, and defendant Kaur has continued to make public statements asserting her complete innocence even after the jury returned its verdict. With such a complete lack of remorse and without any showing of acceptance of responsibility, a Guidelines range sentence is appropriate to afford adequate specific deterrence.

Furthermore, a Guidelines range sentence would afford necessary general deterrence by deterring others inclined to engage in similar offenses. The defendants' conduct is exactly the type of conduct that the forced labor statute proscribes, and this statute was passed, in part, to combat the "growing transnational crime" of human trafficking where "traffickers often transport victims from their home communities to unfamiliar destinations, including foreign countries away from family and friends, religious institutions, and other sources of protection and support, leaving the victims defenseless and vulnerable." H.R. Conf. Rep. No. 106-939 (2000), 2000 WL 1479163, at

*4 (Oct. 5, 2000). A Guidelines range sentence would have the effect that Congress intended in preventing others inclined to commit crimes of this nature. Furthermore, the defendants' crimes were not crimes of passion—their conspiracy was coordinated and calculated over a period of multiple years to maximize their profits at the expense of B.S.—and general deterrence is more apt in cases where the crime is calculated and financially motivated. *See United States v. Howard*, 28 F.4th 180, 208-09 (11th Cir. 2022) (describing, in the context of a financial crime, how "[g]eneral deterrence is more apt, not less apt, in white collar crime cases" because "'economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity,' which makes them 'prime candidates for general deterrence'" (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013))).

The defendants lured B.S. into the United States with promises to help him enroll in school. B.S. hoped to get a better education in the United States, to get a better job after school, and to, ultimately, have a better life with the help of his family members, the defendants. But the defendants did not enroll B.S. in school despite their repeated promises. Starting the first day that he was in the United States, the defendants forced B.S. to instead work in their gas station and convenience store virtually every day from March 2018 until May 2021 for little to no pay. The defendants brought a sixteen-year-old to the United States, isolated him from his family and any friends, and replaced over three years of his childhood with relentless work, and they did so entirely for their own profit. In enacting the modern human trafficking statutes, Congress explicitly recognized the gravity and seriousness of offenses involving the trafficking of persons and ordered the United States Sentencing Commission to "take all appropriate measures to ensure that the[] sentencing guidelines and policy statements applicable to the offenses . . . are sufficiently stringent to deter and adequately reflect the heinous nature of such offenses." H.R. Conf. Rep. No. 106-939

(2000), 2000 WL 1479163, at *27 (Oct. 5, 2000). The serious and heinous nature of this offense warrants a level of punishment within the applicable Guidelines range, and a sentence at the top end of the range is appropriate to adequately capture the length of the defendant's victimization of B.S., the sheer number and severity of coercive measures used, and the repeated and consistent efforts to conceal criminal wrongdoing.

## IV.   RESTITUTION

### A. The Trafficking Victims Protection Act mandates restitution for trafficking victims.

Restitution is mandatory under the Trafficking Victims Protection Act (TVPA). *See* 18 U.S.C. § 1593(a) (mandating that the court "*shall* order restitution" for any offense in Chapter 77, which includes Forced Labor, Conspiracy to Commit Forced Labor, Document Servitude, and Unlawful Conduct with Respect to Immigration Documents (emphasis added)). Restitution under the TVPA is calculated by combining the value of the: (1) "full amount of the victim's losses" and (2) "the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. 201 et seq.)." 18 U.S.C. § 1593(b)(3).

The "full amount of the victim's losses" includes "any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim." 18 U.S.C. § 2259(c)(2) (incorporated by reference in 18 U.S.C. § 1593(b)(3)). This includes "medical services relating to physical, psychiatric, or psychological care," "lost income," and "any other relevant losses incurred by the victim." 18 U.S.C. § 2259(c)(2)(A, D, F). Notably, a court may not decline to order restitution for the "full amount of the victim's losses" because of the "the economic circumstances of the defendant." 18 U.S.C. § 2259(b)(4)(B); *see also* 18 U.S.C. § 1593(a).

The second part of the mandatory restitution calculation—the "value of the victim's labor"—is "the value . . . as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. 201 et seq.)." 18 U.S.C. § 1593(b)(3). The Fair Labor Standards Act (FLSA), incorporated by reference in the TVPA, requires that the defendant pay restitution under this category for: (1) "net back pay"—"unpaid minimum wages" and "unpaid overtime compensation"—associated with the victim's forced work as calculated pursuant to the applicable minimum wage amount in effect at the time and (2) "an additional equal amount" to the net back pay "as liquidated damages." 29 U.S.C. § 216(b) ("Any employer who violates" the minimum wage and overtime standards set forth in Sections 206 and 207 of the Act "shall be liable to the employee . . . affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."). The Fourth Circuit has held that liquidated damages are mandatory as part of restitution orders under the TVPA. *See United States v. Edwards*, 995 F.3d 342, 346-47 (4th Cir. 2021) (holding that an employer that "fails to comply" with Sections 206 and 207 must pay *both* unpaid wages and overtime compensation *and* "liquidated damages of an amount equal to the unpaid wages and overtime compensation"); *United States v. Sabhnani*, 599 F.3d 215, 259-60 (2d Cir. 2010) (upholding the application of liquidated damages as part of mandatory restitution awards under 18 U.S.C. § 1593, stating that "[l]iquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA").

### B.  This Court should order $240,210.76 in restitution to cover the full amount of B.S.'s losses.

In determining restitution, courts may rely on trial testimony or any other evidence "bearing 'sufficient indicia of reliability to support its probable accuracy'" even if such evidence

is "not subjected to rigorous cross-examination." *United States v. Baston*, 818 F.3d 651, 665 (11th Cir. 2016) (quoting *United States v. Singletary*, 649 F.3d 1212, 1217 n.21 (11th Cir. 2011)) (affirming restitution calculation based on victim testimony not subject to cross-examination). Additionally, the "amount of restitution need not 'be proven with exactitude.'" *United States v. Saddler*, 789 F. App'x 952, 955 (4th Cir. 2019) (quoting *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012)); *accord United States v. Williams*, 783 F. App'x 269, 277 (4th Cir. 2019). "[D]etermining the dollar amount of a victim's losses attributable to the defendant will often be difficult and such a determination will inevitably involve some degree of approximation, which is not fatal." *Saddler*, 789 F. App'x at 955 (quoting *In re Sealed Case*, 702 F.3d at 66). Therefore, a district court should merely "establish the amount of the victim's losses with 'some reasonable certainty.'" *Id.*

In this case, the total amount of restitution that the defendants owe to B.S. is established clearly by trial testimony. B.S. testified that the defendants compelled him to work at the Lovely Market every day, besides two days, between March 2018 and May 2021. Tr. 576-80. For the first two months, B.S. worked fifteen hours each day from about 7:00 a.m. until 10:00 p.m., and, after April 2018, B.S. testified that he mostly worked twelve to thirteen hours each day from about 10:00 a.m. until 11:00 p.m. Tr. 283. In January 2021, B.S. described working sixteen hour shifts each day while defendant Singh was in India. Tr. 581. After B.S. escaped from the defendants, B.S. also prepared a log of the approximate number of hours that he worked each day during the months between March 2018 and May 2021. *See* Gov. Trial Ex. 21A. B.S. testified that the log he created approximated the hours that he worked each day but was, overall, an underestimate of the total hours that he worked—the log did not account for those days that B.S. was forced to work at the store beyond the normal closing time. Tr. 724-25.

Consistent with B.S.'s testimony and the log that B.S. prepared, Labor Exploitation Coordinator Rachel Christiansen of the U.S. Department of Labor, Wage and Hour Division, calculated the net back pay owed to B.S. *See* Attachment 2. As reflected in Attachment 2, Ms. Christiansen made week-by-week calculations of the number of hours B.S. worked using the information from the log that B.S. prepared and described in his trial testimony. Ms. Christiansen applied two days off—one in February 2019 and one in January 2021—for the days that B.S. testified to having off in his trial testimony. Tr. 576-80. Ms. Christiansen then determined the "Straight Time Wages" owed by multiplying the total number of hours by the prevailing minimum wage rates applicable each week. An additional "Half Time Premium" was added to the "Straight Time Wages" to account for the required "overtime compensation" under the FLSA. 29 U.S.C. §§ 216(b), 207(a)(1) (requiring employers to pay overtime compensation at "a rate not less than one and one-half times the regular rate at which he is employed" for any hours over forty each week). Ms. Christiansen then subtracted the defendants' payments to B.S. as reported in B.S.'s log to determine the total net back pay to be $120,105.38.

As described above, under the FLSA and TVPA, B.S. is entitled to "an additional equal amount" to the net back pay in mandatory "liquidated damages." 29 U.S.C. § 216(b); *see* 18 U.S.C. § 1593(b)(3). Therefore, B.S. is entitled to an additional $120,105.38 in liquidated damages.

Furthermore, when multiple defendants contribute to a victim's losses, "the court may make each defendant liable for the full amount of restitution." 18 U.S.C. § 3664(h); *see* 18 U.S.C. § 1593(b)(2) (incorporating 18 U.S.C. § 3664(h) by reference); *see also United States v. Williams*, 319 F. Supp. 3d 812, 817-18 (E.D. Va. June 8, 2018) (holding defendants jointly and severally liable for restitution, even when two of the defendants handed off most of the victims' commercial sex proceeds to other defendants); Judgment in a Criminal Case, *United States v. Zahida Aman, et*

*al.*, No. 3:19-cr-085 (JAG), (E.D. Va. January 24, 2023), ECF No. 293 (ordering restitution jointly and severally among multiple defendants in a forced labor case). Both defendants, here, conspired and worked together to compel B.S.'s labor and cause his losses throughout the charged time period, and so each defendant should be held "liable for the full amount of restitution." 18 U.S.C. § 3664(h).

The Court should, therefore, order the defendants jointly and severally to pay restitution to B.S. in the amount of $240,210.76—$120,105.38 for unpaid back wages and $120,105.38 for liquidated damages.

## V.   CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court impose a sentence of 168 months' imprisonment at the top end of the Guidelines range. This sentence sufficiently reflects the seriousness of the defendant's crimes but is no greater than necessary to satisfy the purpose of sentencing set forth in 18 U.S.C. § 3553. The United States also requests that this Court order the defendants jointly and severally to pay restitution in the amount of $240,210.76 in accordance with 18 U.S.C. § 1593.

Respectfully submitted,

KRISTEN M. CLARKE
ASSISTANT ATTORNEY GENERAL

By:   _____/s/_____

Matthew Thiman
New York Bar No. 5494554
Trial Attorney
Criminal Section, Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave., N.W.
Washington, District of Columbia 20530
Office Number: (202) 514-3204

Fax Number: (202) 353-8154
E-Mail: Matthew.Thiman@usdoj.gov

JESSICA D. ABER
UNITED STATES ATTORNEY

By:         /s/
Avi Panth
Virginia Bar No. 92450
Peter S. Duffey
Virginia Bar No. 39477
Assistant United States Attorneys
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
Office Number: (804) 819-5400
Fax Number: (804) 771-2316
E-Mail: Avishek.Panth@usdoj.gov
E-Mail: Peter.S.Duffey@usdoj.gov